Good morning, all. 216-0825. People of the State of Illinois v. Melissa Calusinski. Representing Ms. Calusinski, Ms. Kathleen T. Zellner. On behalf of the people, Ms. Mary Beth Burns. Good morning, Counsel. Good morning, Governor. Good morning to all of you. May it please the Court and Counsel. I think the issues are very clear on our case. Is there a Brady violation? Have we met the requirements of a Brady violation? We have gone through a third stage evidentiary hearing. We must demonstrate manifest error in the trial court's factual findings and credibility findings. We believe that we can meet that burden. First, Counsel, I have a question regarding the State's duty of disclosure regarding the x-rays. After the September 7, 2011, disclosure of the x-ray in the JPEG form, both the State and Defense Counsel were in court. And in open court, the State and Defense Counsel agreed to work together so that readable x-rays would be made available to the defense. The trial court invited the parties to come back into court and advise him if there were any problems. Indeed, Defense Counsel asked for and got an order from the trial court on October 21, allowing it to view all of the evidence that the coroner had, including the computer. Here, under those facts and circumstances, how was the effect, any suppression of the version of the x-ray on the coroner's computer, the TIFF version of this particular skull x-ray, how was there any suppression if the defense had access to it? And how, then, would this be a Brady violation? Yes, Your Honor, I think that's a pivotal question in the case. So going back to the September 7 disclosure of the disk, at that point in time, Mr. DeLuca was told that the x-rays, which we now know were in a JPEG format, so they were compressed, 98% of the data was not present. They were condensed down to 1% of the data. He was told that those x-rays were illegible, that the coroner's assistant was on vacation, but that those were illegible, and then he had a subsequent conversation, he testified to with the assistant state's attorney, that had she had any luck opening up with the Tiger View program the x-rays, she also said no, they had had no luck. The assistant state's attorney, Dee Martini, claimed that he went on September 16 to meet at the coroner's office with Mike Reed, and at that time, they attempted to improve the quality of the x-rays, and they were unable to do so. So this is why the credibility findings in the case are important. There is no question that the TIFF images, 48, 49, and 50, 49 and 50 are the two crucial ones, were saved in TIFF format on the coroner's computer. They were there the entire time. The question is, what is the duty of Mr. DeLuca to have taken that next step when he was given the illegible x-rays in a JPEG format, and to go in himself after the assistant state's attorney had talked to supposedly Mike Reed, and again been told the x-rays cannot be enhanced or improved. But he indicated, did he not, by the subpoenas he issued and getting an order from the court himself, that allowed him to go into the coroner's office, the computer, and look at it apart from any disk that he was given? The order that Mr. DeLuca got was for the general discovery that he could examine all of that. But if we look at the Delcrete case and compare, what is the duty of the defense attorney when they have not been fully disclosed? In that case, the parole letter. What is the duty of that defense attorney, Mr. Bretz, to pursue and assume that something has been withheld from them? I think that Mr. DeLuca relied on the representation made in court that the x-rays were illegible. He says he had subsequent conversations with ASA Bishop of whether she'd been able to open up the x-rays and was told that she could not. And then we had Mr. DeMartini testifying that they were unsuccessful when he was in the coroner's office opening those images. Now, that's a lot of information past the initial disclosure that would have dissuaded Mr. DeLuca from conducting a further inquiry about the x-rays. And I think what the court said in Delcrete is that, yes, Mr. Bretz could have called Detective Kroll. He could have possibly discovered this nondisclosure. But there in this case, we have what appears to be a more deliberate effort to withhold this evidence. We contended at the evidentiary hearing there never was a meeting with DeMartini and the coroner, Reed. Coroner Reed, Assistant Coroner, said the first time he was involved in the case was in 2015. He didn't have a meeting. He didn't open up the new images. He didn't make any misrepresentations. He didn't make any representations about not being able to access the TIF images. But the facts are as they are. As the court has outlined, yes, Mr. DeLuca could have gone in, could have second-guessed them, could have gone in, and could have perhaps with the assistant. But I don't know who it would have been because Mr. Reed – Well, he could have brought his own experts in with him when he went, isn't that correct? Possibly he could have, Your Honor. And I guess it depends on what kind of duty are we going to impose on defense attorneys. When you have that representation in open court that the x-rays are illegible, when you try yourself to look at them, when your own expert gets similarly – remember, Dr. Tease also got the JPEG images reduced down to 20 kilobytes. Well, there was a question in the record as to which she looked at, wasn't there, counsel? Actually, Mr. DeLuca submitted an affidavit, which is one of our exhibits, that he confirmed that she'd gotten the JPEG images. Our expert testified those were even further reduced down below what Mr. DeLuca had received. But then, nevertheless, part of her testimony at the trial was that she saw a defect in the autopsy photos that could have been a fracture. Isn't that correct? She said that she was uncertain if it was a fracture or not. That's why this new evidence is so important, because the TIFF images establish a critically important fact in the case that was told incorrectly to the jury. The jury was told, even in the closing argument, the jury is told that the cause of death was a skull fracture, and it was a through-and-through fracture. That's in the closing argument, and that's at page – I think it's – I can give you the exact site to it. Because I thought it was – it's on page 4732. The first proposition we have to show that the defendant performed an action that caused death. We have it. What were the acts? Threw him in the ground, cracked his head. But they also received an instruction regarding cause of death that went beyond that. Isn't that correct? Correct. And I think the issue is we're really talking about manner of death, because what Dr. Zimmerman did at the evidentiary hearing – and remember, there's no radiologist that ever testified in the Kalisinski case, because we have illegible X-rays. We – that's what Mr. DeLuca thought. But they weren't illegible. And Dr. Zimmerman, a pediatric neuroradiologist, testified to several things that would have changed the outcome in the trial. One is there's absolutely no fracture. Two is no one on a clinical exam ever touched the fracture. So Dr. Montes did not touch this fracture and did not manipulate the fracture. Dr. Choi never saw a fracture. There is not a fracture. Dr. Choi didn't see a fracture? He testified he did. There's no fracture. He didn't see a fracture. Well, because – So he would have refuted what he said also. Go ahead. Get some water. Dr. Zimmerman testified that he did not see a fracture on the TIFF X-ray. But Dr. Choi testified that in his physical examination of the skull, he not only saw a fracture with his naked eye, but he touched the fracture and felt it as well. And that was the testimony, actually, of Dr. Montes as well. And two of the defense witnesses, we talked about Dr. Teese, but Dr. Lietzma indicated that there was a linear fracture consistent possibly with a short fall. And Dr. Lietzma testified that it could not be ruled out that the victim was slammed to the floor. And so that defense witnesses at the trial also testified based on photographs, not viewing, of course, the TIFF X-ray that Dr. Zimmerman saw. Right. But that is what's so crucial, Your Honor, because the data given to the defense attorney was reduced down to 1%, a 98% reduction of the data. He did not get a pediatric neuroradiologist. Dr. Zimmerman's testimony isn't speculation. Dr. Zimmerman testified there absolutely was not a fracture in this child's skull. That is different. In his opinion. And as a renowned abusive head trauma expert who wrote the definitive paper for the National Institute of Health. So we didn't have the benefit of having a radiologist testify at her trial that there was not a fracture. If there had been such a radiologist as Dr. Zimmerman, I do not think Dr. Montez's rebuttal would have stood unimpeached because it was unimpeached. What Dr. Zimmerman said is there cannot be a clinical finding of a fracture based on the TIFF X-ray. There is no skull fracture. This was supposedly a through and through fracture. So the trial evidence of forensic pathologists, none of whom looked at the X-ray, no slides were taken, as Dr. Teese said. You must do a histology if you don't have the X-rays to determine if there's a fracture. So you have people looking at photographs and you have two doctors talking about manipulating a fracture. That's what Dr. Jones in her affidavit in 2015 said. What Dr. Choi did and Dr. Montez did was they confused an accessory suture. There's an identical fracture if you're confusing them on the other side of the baby's head. But Dr. Jones didn't testify that she saw a fracture. No, no. She said that they confused the fracture, that they confused the fracture with the accessory suture. And she said that was a common mistake that was made. But what's so important, I'm sorry, Your Honor, I feel like I'm interrupting. Finish your sentence. I'm sorry. What's so different about what we produced at the evidentiary hearing was we had clear TIFF images, 16 megabytes, 17 megabytes. We had a pediatric neuroradiologist who testified there was not a fracture in the skull. And no one on a clinical exam had touched a fracture or manipulated it. So if Dr. Zimmerman had been at the trial, the jury would have heard that. Dr. Choi testified that X-rays were taken and that the quality of the X-rays probably wasn't very good. Isn't that correct? It's very self-serving that he testified to that because he never asked Paul Foreman to reshoot the X-rays, which he had done in the past, and that's what Mr. Foreman testified to. Whenever we had a problem with the X-rays, he would ask me to reshoot them. And we know the X-rays that were saved in 2009, we know those X-rays are perfect. We know they've got all the data that was needed to determine if there was a fracture. Why does Dr. Zimmerman's opinion invalidate the opinions of all these other experts who testified that there was a skull fracture, counsel? Dr. Zimmerman's opinion invalidates all of those experts because none of them have the qualifications that he has. They had the qualifications to do the job that they did. Dr. Zimmerman, with all due respect, could not have conducted the autopsy, counsel, and done the examination of the body. Well, let's look at the autopsy result. Dr. Choi admitted in his affidavit he made a mistake about the chronic subdural hematoma. Only with respect to the age. No, he made a mistake and he said it didn't exist, and Dr. Greenbaum said it did not exist, and she looked at the slides. That is a big mistake in an abusive head trauma case to have told this jury there was no chronic subdural hematoma when there was. We have an affidavit from the pathologist who did the autopsy. You have two giant mistakes. No expert came off their opinion that there was a skull fracture, though, correct? At which point? After all this came to light. You mean at the trial? He indicated that Dr. Choi indicated later that there was an old head wound that he was mistaken. Right. But neither Dr. Choi nor any other expert came off the fracture comments, correct? They were never presented with the evidence from Dr. Zimmerman. When we got the affidavit from Dr. Choi, we were strictly at that point we didn't know about the x-rays. We didn't know about the compressed data. So all we had approached him about was the chronic subdural hematoma. We had no idea that there actually was not a skull fracture. And if you look at, in the court's opinion in 2014, when the court talked about the corpus delicti of this crime and how it corroborated the confession, the medical evidence corroborated the confession, the other key point that Dr. Zimmerman said is this skull fracture that's been described not only doesn't exist, there is no skull fracture, it does not fit the rendition of the defendant in the interrogation tape. She was holding the child facing out. He said if you had this forceful impact on the floor, you would have a fracture on the front, not the back of the skull. Well, but if one views that reenactment, there is no way that the reenactment portrays what actually happened on the floor. The camera doesn't pick that up, counsel. And the defendant's discussion with the detectives in her discussion, she mentioned three times that during the course of that part of the incident, the child hit his head, the back of his head, on the floor three times. So that Dr. Zimmerman either didn't see or didn't pick up or didn't mention in his testimony, but it's not viewable on the reenactment tape. I agree, Your Honor, that the camera doesn't catch what when she finally moves to saying that she lost her temper and threw the child down was immediately after Detective Falenco came in the room and said, what you're telling us isn't true. You're not showing enough force because a fracture caused his death. That is a quote from Falenco at that point in the interrogation tape. She takes the teddy bear, which is about a third the size and a fraction of the weight of Ben Kingan, and demonstrates, but she's still demonstrating, and she said she picked him up facing out, and that matters. So we have, is this a verdict that's worthy of confidence? When you have two medical findings that have now been refuted, one by the state pathologist that there's no chronic subdural or that there is a chronic subdural hematoma, and then the second one by a pediatric radiologist, of course, there were no radiologists at the trial, who says there never was a fracture. You have two major medical findings. The other thing that Dr. Zimmerman said is the hemorrhages, subdural, subarachnoid, and subgaleal, are consistent with an accident. Those are consistent. What is not consistent in the literature, and he's authored some of those peer-reviewed documents, is the linear through-and-through fracture. That is consistent with abusive head trauma, and that doesn't exist. Excuse me, could I give you time for just one second? Let me just see if there was a question. Okay. Thank you. You'll have time to move on. Yes, thank you. Thank you. Ms. Burns? Good morning, Your Honors. Good morning. May I please record, my name is Mary Beth Burns, and I represent the people of the state of Illinois. We come before Your Honors this morning to respectfully ask you to affirm the trial court's judgment in denying post-conviction relief following a third-stage hearing. As this court is aware, and as counsel mentioned, this court asked us to be prepared to discuss a recent third-district case, Del Perret. In addition to various factual differences, I think the thing to take away from Del Perret is the thing that we have argued here, which is the trial court should be affirmed because it followed the standards of review. This court typically will, following a third-stage hearing, affirm the trial court when the trial court's factual determinations are based on the manifest weight of the evidence. In Del Perret, the result is different, but it's the same mechanism. The appellate court in the third district affirmed the circuit court's determination, in that case a factual determination that there was a letter that had not been tendered. And here you've got a factual determination that whether the quality of the X-rays was appropriate at that point in time, those X-rays were in fact tendered. Well, how is turning over an unreadable, illegible X-ray compliant with the state's discovery obligations, counsel? I think that the trial court was attempting to get the discovery clarified by ordering the opening of the coroner's computer and other records. And those things are always available. How would Mr. DeLuca know that there was a more legible X-ray on the computer when the only thing that was told to him in open court by A.S.A. Bishop was that it was unreadable? I guess my concern would be where the trial court said that you could talk to the coroner's office, you could talk to the coroner and assume that A.S.A. Bishop knew as little about computers as Mr. DeLuca perhaps did, and as I, standing here, know very little about computers. But if I'd been given access to the actual computer where the images were stored and I would be given access to the coroner's files, I would believe that was in fact the court ordering the discovery availability. Just a couple weeks before the trial started, though, right? I mean, that wasn't much time, was it? It was not a great deal of time. There was, however, enough time that if the defense had, let me back up one second. I guess that part of the trial court's determination at the third stage hearing is that the defense did not pursue it further because his theory of defense did not require the X-ray to show or not show a fracture. Dr. Chakoutis based her opinion not knowing if there was a fracture and not being convinced that there was. Dr. Tease had, in fact, had a significant amount of the information, including histology slides, and it was the trial court's belief that she also had had the coroner's actual X-rays. So to the extent that Mr. DeLuca's theory did not require there to have been a fracture or not a fracture, that his theory was that the confession did not match the medical evidence and where the medical evidence did not absolutely show trauma, that the jury could disregard her testimony. But defense conceded the fracture because it didn't have evidence that it didn't exist. Obviously, Dr. Zimmerman testified afterwards. So they didn't have the option. Well, and again, they had the option of getting a different, getting a forensic radiologist, had they wanted to, to actually blow up the X-rays in the same way that they were done prior, at the hearing. The impression that I've gotten from reading the record and from reading the trial court's order in the third stage hearing is that everything the state had, the state turned over, and that everything that the state turned over was capable of being opened in usable format. The other question that I have... Well, excuse me, the JPEG? The state, I'm sorry, maybe I didn't misunderstand you. The state had the JPEG version, correct? I believe so. I guess the impression that I got is that what was turned over was capable of being opened up and it might have required getting a computer expert to do so. But the state tendered what it had, which was capable of being opened. Was that enough? Yes. To satisfy their obligation of disclosure under Brady? Yes. Why? Because they tendered what they had. Brady is about suppression. Nothing prevented, and again, nothing prevented both the state and the defense from going to the coroner and saying, we can't read these, open them up for us. Because from Dr. Teed's report, apparently she did read them. And my understanding is that she either was physically at the coroner's or she had access to coroner's records. And so where Dr. Teed's had been able to read them, they were readable. And the fact that the trial court, in encouraging discovery, encouraged them to go to the coroner's and have access to everything, including the computer, shows that, in fact, this was available material. But now the jury never heard an expert that Ben's skull was not fractured, isn't that correct? I believe that Dr. Teed said that she was unsure of it. I believe Dr. Leisman's testimony was based on the assumption that it was. All right. But Dr. Zimmerman's testimony would have opened up a completely new theory that was unavailable to the defense at trial, and which goes to the very heart of the verdict, isn't that correct? I think that I would question whether it was unavailable, again, because all the coroner's data was available to the defense and to the state both. Also, Dr. Zimmerman said that the X-rays were badly taken. And so, although Dr. Zimmerman is a noted expert, where Dr. Zimmerman also said that they were not good X-rays, I'm not sure that I believe that it undermines the testimony of the emergency room physician, the two coroners who actually saw the body physically, including looking things with their two eyes and then looking at things with photographs. And so I'm not entirely sure that Dr. Zimmerman's view of what he considered bad X-rays undermines the medical evidence that was already presented. Wouldn't the question be whether or not there was a reasonable probability that the jury would have credited Dr. Zimmerman's testimony that there was no fracture? Isn't that what we should be asking ourselves? Well, for a Brady claim, the first thing one has to be asking was, was the information tendered? Materiality comes after. For Brady, you have to have both thresholds. You have information that was withheld, and you have to have that information demonstrably material. Nothing was withheld here. Was the trial court in a position to say that the J-plan was just as good after it was enhanced as the TIF? My understanding from the record and from his comments is that when it was enhanced, it was far more readable and that the enhancement was a readily available operation of the program. Is that within his purview to make that finding in light of a radiologist testifying to the contrary and no one else testifying the way that the trial court held? As the trier of fact, it is his purview to make that determination. So we can look at an X-ray and determine whether or not that X-ray is readable for purposes of a diagnosis. By a radiologist. A judge can do that. Okay, if we're asking the judge to be the trier of fact, as we are at a third stage evidentiary hearing, then it is the purview of the trier of fact to determine whether the evidence, the credible evidence taken as a whole, undermines faith in the jury's verdict. And that is what we ask judges to do on a day-in-day-out basis. Well, that's the materiality part. I'm talking about whether it was actually tender. You're arguing two different things. Well, right, I'm arguing... You're arguing, first of all, that it was tender, that these things were tender. What was tender was the JPEG, correct? Yes. Okay. And the judge made a finding after the third stage that that was tender. And the reason he made that finding was because it could be enhanced by the time review. Right. And, again, the tighter part of the program was part of what was tender. So I get back to my question. Does a judge have the expertise to determine whether something is radiologically solid? The judge can make a determination based on a radiology expert who said that they were not well taken. Other than that, again, a trial court is not a medical expert. But, again, looking at this case, both at the trial and at the third stage evidentiary hearing, there was a significant amount of medical evidence presented. You had the child's treating physicians, his pediatricians. You had the emergency room doctor. You had the doctors who performed the autopsies. You had Dr. Zimmerman later. You had Dr. Jones. Again, there was a significant amount of medical evidence at various stages. You had the treating physicians. You had the emergency physicians. You had the autopsy pathologists. You had subsequent pathologists who came in later. So all saw a skull fracture except who? I'm sorry? All saw a skull fracture except who? I think that's correct. Again, the original treating pediatricians never saw evidence of earlier injury. The emergency room, if I have this correct, and the two pathologists who did the autopsies, each saw evidence of skull fracture. And each, and Dr. Montez especially said that he manipulated it. So they actually saw the skull fracture with their eyes. Again, Dr. Zimmerman did not see the body, did see all the photographs, I assume, and all the histology, and saw the X-rays. I'm not entirely sure, and again, you're correct, I'm arguing two things. I'm not entirely sure that Dr. Zimmerman's testimony, based on what he specifically said were not good X-rays, can be taken definitively that there was, in fact, no skull fracture. Perhaps more important for our situation here, one of the defense experts, Dr. Tease, was never convinced it was a skull fracture, and the jury heard her opinion that was based on other medical evidence, including her belief that there had been earlier injuries that were healing. And so the jury heard things that did not include a skull fracture as well. So is it your position, or was it the position of the state at the time? It seems to me that that's what I'm hearing the defense propose, that merely because if there were no skull fracture, then it could not be a homicide. Is that your position? It would be my belief that the defense position is that if there was no skull fracture, there was a homicide, there was no homicide. I'm not entirely sure that, and again, this goes, everyone here has done multiple child abuse cases, and when you talk about a situation where you've got the three forms of hemorrhage, they sometimes show up that way in shaken baby cases. They sometimes show up, I think, more typically in what would be blood trauma cases, which would be this type of a case. I do not believe where you have the child's treating pediatricians saying that there had never been evidence of him having an injury. And again, it's after T's, and I believe after Lysma. Well, counsel, they didn't take an X-ray then back in October when he was injured. These pediatricians never took an X-ray. No, they did not. They were basing it on the way his symptoms presented. Correct. And there can be some debate about how a child would react or not react. I will say that, and I think even the defense, I believe, even the defense experts, did not think that he could have caused the type of ongoing injury that they believed had happened simply by his traumatic throwing himself around, which apparently he did have a long-term history of doing. You would agree, though, that the state relied extensively on the fracture to determine abuse as opposed to a chronic condition. Absolutely. And now the defense has come up with an expert to say there was no fracture. And you're saying that doesn't affect the materiality of the situation. I'm saying that I don't think it's sufficiently compelling to undermine a verdict that was based on a significant amount of medical testimony, two of which were defense experts. And it's my recollection that the jurors were instructed that they did not have to disregard for confession even if they found whatever occurred was only a partial cause of the death and that the death, in fact, did result from an earlier injury. Thank you, Your Honor. Thank you so much. Back to Justice Burke's question at the evidentiary hearing, because it ties to another point that I want to make. The judge did attempt to step into the shoes of a pediatric neuroradiologist when he compared in the states except at 137 the JPEG with the TIF and concluded as if he could interpret it himself that there was no sufficient difference in the quality. They were essentially the same. So what happened at the evidentiary hearing is the state declined to present a pediatric radiologist or a radiologist to try to refute Dr. Zimmerman. They did not have Dr. Montes or Dr. Choi testify that they were absolutely certain that there was a fracture. Rather, there was no response to Dr. Zimmerman in terms of a comparable expert. And then the judge made a decision, which is ludicrous, because a JPEG and a TIF image are absolutely not the same. Counsel also misstated what Dr. Zimmerman testified to. Dr. Zimmerman testified the JPEG image was unreadable and inferior. Dr. Zimmerman testified that the TIF image was perfect, and that's how he could see that there was no skull fracture. So she's confusing what he said. All of the experts at the trial, none of them looked at the X-rays, and only two of the prosecution witnesses actually claimed to have touched the fracture. So no one else ever saw the skull or anything. And that's why their testimony, if their testimony is refuted, the jury heard from Dr. Montes, the last thing the jury heard in this case was there was a through-and-through fracture, and he was manipulating it, and that there was blood in the fracture, and that it was this violence that had been inflicted upon this child. And now what we know is that that isn't true, that there was no through-and-through fracture, that there's not a fracture, and that stands unrebutted. Well, that's not Dr. Zimmerman's opinion that there is no fracture. That is the opinion of the only neuroradiologist who's ever testified in Melissa Kalisinski's trial. She did have the benefit of a Dr. Zimmerman at her trial, despite the state mentioning 93 times the skull fracture. It was the key point from the confession on in driving this to an intentional act. Now, your burden at this point is that the defendant has to show that the favorable evidence could reasonably have put the whole case in such a different light as to undermine the confidence of the verdict. That's your burden at this point. That is correct. You have one doctor who says there was no skull fracture, and you have a plethora of other doctors who all say that there was. How are you going to meet that burden? Okay, because there's actually two components to it. One is that we have proved without rebuttal through an image expert that this x-ray that was turned over was compressed, and the actual TIF x-ray existed. No one else in the trial got to see the TIF x-ray. If the pathologist, maybe they could have determined, too, there was no skull fracture. But I don't think you can diminish Dr. Zimmerman's role because it's the pivotal issue in the case, and we have a judge making a decision and reading the x-ray. So the question is, did Melissa Kazinsky get a fair trial? Because the other component of this is that the state contended all the way through that this baby was healthy, there were no prior injuries. Yes, he had this little bump on his head in October of 2008. What do we know now? We know there was a chronic subdural hematoma that the pathologist who performed the autopsy said he made a mistake and didn't see that. That also has to be computed into the reasonable probability, this is a case that went down on the forensic expert evidence, a reasonable probability that the outcome, not that it would result in an acquittal, that's not the standard, it's not a sufficiency standard. A reasonable probability the whole case would be put in a light that would undermine confidence in the verdict. How is this a fair trial? Defense witnesses at the trial also testified. In fact, that was the theory, that this was a chronic subdural hematoma situation. So there was that testimony. There was, but imagine if you had the state pathologist who did the autopsy saying, you know what, they're right, there was a chronic subdural. That's pretty huge. I've not seen that in my career. But on top of it, I think the skull fracture, yes, one man, Dr. Zimmerman, who is, you know, one of the leading experts in the United States, and he questions the confession. He is saying no way anyone saw or touched the fracture in autopsy. That's huge evidence for a jury to consider. This was not a fair trial. This was not a fair trial. Thank you. Thank you very much, counsel. Thank you, counsel, for your arguments this morning. The court will take the matter under advisement and render a decision in due course. Court stands in recess for the day.